FILED
2012 Feb-21  PM 03:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

VICKI LAURA BYNUM,

     PLAINTIFF,

VS.                        CASE NO.: CV-11-J-2535-M

MICHAEL J. ASTRUE,
Commissioner of Social Security,

     DEFENDANT.

## <u>MEMORANDUM OPINION</u>

This matter is before the court on the record and the briefs of the parties. This Court has jurisdiction pursuant to 42 U.S.C. § 405. The plaintiff is seeking reversal or remand of a final decision of the Commissioner of Social Security. All administrative remedies have been exhausted.

### Procedural Background

The plaintiff applied for disability insurance benefits ("DIB") and supplemental security income ("SSI") due to herniated discs in her lower back, diabetes, growths on the bottom of her feet, carpal tunnel syndrome, anxiety attacks and high cholesterol (doc. 132). The administrative proceedings leading to this action began on September 26, 2008, when the plaintiff filed an applications for DIB and SSI, which were denied (R. 49-60, 128).

The plaintiff requested a hearing, which was held by video conference in front of an administrative law judge ("ALJ"), on June 21, 2010[1] (R. 24-48). The ALJ thereafter rendered an opinion finding that the plaintiff was not under a disability (R. 9-17). The plaintiff's request for administrative review of the ALJ's decision by the Appeals Council was denied on May 9, 2011 (R. 1-3). The ALJ's decision thus became the final order of the Commissioner of Social Security. *See* 42 U.S.C.§ 405(g). This action for judicial review of the agency action followed (doc. 1).

The court has considered the record and the briefs of the parties. For the reasons set forth herein, this case is **REVERSED and REMANDED** to the Agency to further develop the record as instructed herein.

## Factual Background

The plaintiff was born February 5, 1951, and has an Associates Degree in business (R. 30, 36). The plaintiff has held a wide variety of jobs, including secretarial, sales, paralegal and receptionist (R. 31). She last worked in August 2008 at a sports store (R. 31). She injured herself at work in February of that year, but continued working until August, when she "could no longer stand up. I could not take a step....I was in a tremendous amount of pain" (R. 31, 37). After injuring her back at work, she went to physical therapy twice, then fell on a wet floor at work and

---

[1]Unfortunately, the transcript of the hearing reflects that the audio quality was poor, the plaintiff had trouble hearing, and numerous statements were inaudible.

was sent to occupational health (R. 38).  The Vocational Expert (VE) testified the plaintiff's past work ranged from sedentary to light and from semi-skilled to skilled (R. 44-45).

According to the plaintiff, since having surgery for trigger thumb on her left hand, she often has trouble gripping things (R. 32, 37).  She spends five to seven hours a day in bed to ease the pain in her lower back (R. 32).  She testified that she will do a few things, then go lie down (R. 33).  She is constantly having to change position (R. 33).  The plaintiff believes she can stand for about two hours a day, but not continuously (R. 33).  By affidavit, the plaintiff later clarified that she had trouble with the sound during the hearing, and although she stated she could stand for two hours, she meant that as across the course of a day[2] (R. 106).  She averred that the most she could stand continuously would be 12 -15 minutes (R.106).  She stated she cannot sit too long either because of sciatica, and neuropathy, and additionally has problems with carpal tunnel syndrome in one arm (R. 36).  She does drive occasionally and sometimes does the grocery shopping, although her aunt helps (R. 39).

---

[2]The ALJ's opinion in this case is dated July 6, 2010 (R. 17), and the plaintiff's affidavit is dated July 23, 2010 (R. 106).  Thus, the ALJ did not have the benefit of plaintiff's clarification.

According to the plaintiff, her pain is a seven on a scale of one to ten on a daily basis, which prevents her from doing light exercises and leaves her unable to do housework (R. 35, 40).  The plaintiff also takes medication for stress and anxiety (R. 34).  Additionally, she suffers from irritable bowel syndrome, which flares up if she gets frightened or upset; and from diabetes, which she controls by diet (R. 34).

The plaintiff is prescribed Lyrica for fibromyalgia and herniated discs (R. 40). Lyrica eases her pain to a five or six if she is lying down (R. 42).  She had one epidural injection for her back, and was supposed to have trigger thumb surgery on her right hand, but it never occurred because she had to have an MRI for her back in the meantime (R. 41).

The plaintiff's medical records from the relevant time period reflect results from an MRI in April 2008 which include severe degenerative disc disease at L4 and L5 interspaces with near complete collapse, a large sub-ligamental herniation centrally and left at L5, and moderate spinal stenosis at L4 (R. 67, 235).  The plaintiff received an epidural injection in April 2008[3] (R. 68, 231-233, 257) and in follow up examinations she reported that she received great benefit from it (R. 229-230). Specifically, she stated her symptoms were almost completely resolved (R. 229, 236). Dr. Gary Cohen recommended physical therapy and a home exercise program, and

---

[3]The record reflects her doctor's opinion that she had a fair chance of success with the injection, and a fair prognosis if she did not have it done (R. 606).

discharged her in June 2008 (R. 229-230).  Upon discharge, her diagnosis was "left lumbar radiculopathy – resolved – with history of HNP L5-S1 and lumbar spinal stenosis" (R. 229).

The records also confirm that plaintiff had bilateral trigger thumbs,[4] for which she had surgery for left trigger thumb release in March of 2008 (R. 242, 294).  A steroid injection was given for her right trigger thumb (R. 243-244, 294, 300).

Other medical records reflect diagnoses of anxiety, depression, high blood pressure, obesity, stress, fatigue, non-insulin dependent diabetes, insomnia, low back pain and polyarthritis in September 2008 (R. 246, 249, 251).  Additionally, the plaintiff was noted to have painful nodules on her feet (R. 249, 250).  In December 2008 plaintiff's regular treating physician stated that, in his opinion, the plaintiff was physically disabled due to hypertension, high cholesterol, irritable bowel syndrome, carpal tunnel syndrome, allergies and hypoglycemia, which render her unable to work (R. 353).  A medical record from that time reflects she suffers from depression and

---

[4]Trigger finger is caused by a narrowing of the sheath that surrounds the tendon in the affected finger. People whose work or hobbies require repetitive gripping actions are more susceptible. Trigger finger is also more common in women and in anyone with diabetes. http://www.mayoclinic.com/health/trigger-finger/DS00155. *See also* http://www.webmd.com/osteoarthritis/guide/trigger-finger  ("Trigger finger and thumb are painful conditions that cause the fingers or thumb to catch or lock in a bent position. The problems often stem from inflammation of tendons that are located within a protective covering called the tendon sheath").

insomnia as well, but notes that "[patient] is refusing any further [illegible] or referral as she doesn't have any funds" (R. 529).

On December 20, 2008, the plaintiff was seen in the emergency room for back pain which she described as a 10 out of 10 in pain level (R. 456, 465, 467). She was noted to have bilateral paralumbar tenderness and spasm (R. 465). X-rays on that date found moderate degenerative discopathy and facet arthropathy at L4-5 and L5-S1. The emergency room doctor formed a diagnosis of mild lower lumbar spondylosis (R. 459). She was also noted to have radiculopathy, acute sciatica, and degenerative disc disease of the lumbar spine (R. 466). She was given shots of Decadrone and Dilaudid, and received prescriptions for Demerol, Toredol and Phenergan (R. 463, 464, 468). Additionally, the plaintiff was told to follow up with Dr. James White (R. 466).

Later in December of 2008 the plaintiff went to Dr. White, who noted upon physical examination that the plaintiff had a herniated L5 disc and degenerative L4 and L5 discs (R. 368). These records reflect plaintiff's complaint that her symptoms had become progressively worse (R. 379). He referred the plaintiff for x-rays and another MRI (R. 368). He also noted the plaintiff was "private pay" and provided her with options and price (R. 377).

X-rays of plaintiff's back in January 2009 reflect demineralization with disc space height loss and vacuum phenomenon at 4/5 and 5/1, mild lower scoliosis with moderately prominent facet sclerosis and osteophytic spurring (R. 363). An MRI of plaintiff's lumbar spine at that time found mild underlying rotary scoliosis, multilevel degenerative disc signal changes, most prominently at 4/5 and 5/1, moderate facet DJD at multiple levels, 4/5 disc space height loss, probable right spondylolysis[5] and mild right spondylolisthesis,[6] and eccentric disc bulging and facet DJD, more prominent on the right (R. 364). There was also significant narrowing in the right lateral recess at the 4/5 level, with likely impingement on the right 5/1 root, and moderate bilateral foraminal narrowing at 5/1 (R. 364). Dr. White reviewed these test results and opined that the plaintiff has lateral recess stenosis and markedly degenerative discs at L4 and L5 and probable herniation (R. 366). He listed plaintiff's options as "live with her symptoms ... go to pain management or we could do myelography to see if anything could be repaired surgically. I am not sure what to tell her ... I will release her and let her consider her options" (R. 366).

---

[5]Spondylolysis is a stress fracture in one of the bones of the spinal column.

[6]When a stress fracture weakens the bone to the point it is unable to maintain its proper position, and the vertebrae shifts out of place, the condition becomes spondylolithesis rather than spondylolysis. Nerve damage, including leg weakness, may result from pressure on the nerve roots and cause pain radiating down the legs.
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002240/

In March 2009 plaintiff's regular treating physician, Akil Taher, completed a form concerning disability, only part of which is legible in the record[7] (R. 522-523). He opined that the plaintiff was unimproved, that she was totally disabled, that she would never be able to return to work, and that she was not a candidate for rehabilitation (R. 522-523). In February, June and August 2009 the plaintiff was again seen by Dr. Taher (R. 520, 522, 524). Those records reflect the plaintiff continued to suffer from anxiety, parathralgias, neuropathies, radiculopathy and insomnia (R. 520, 522). She reported pain in her right knee and records reflect it was swollen (R. 524). Her doctor increased her doses of Lyrica and Zoloft (R. 520).

In August 2009, Dr. Alan Pernick, at the same clinic as Dr. Taher, stated that the plaintiff was getting treated for lumbar disc disease, fibromyalgia, hypertension and anxiety (R. 538). Records from that time reflect that plaintiff reported Lyrica "is helping make pain tolerable" (R. 539). Her diagnoses at that time included fibromyalgia, depression, anxiety and high blood pressure, and her Xanax dosage was increased (R. 539).

Dr. Taher wrote an additional letter in May 2010 in which he opined that the plaintiff suffered from irritable bowel syndrome, chronic back pain, hypertension, hyperlipidemia, depression, anxiety, neuropathy, and insomnia (R. 610). Dr. Taher

---

[7]The March 2009 report appears to have had a June 2009 record placed on top of it when it was copied, resulting in solely the very bottom of the first page being visible. *See* R. 522-523.

recommended numerous tests and referrals to specialists due to her long list of ailments (R. 610).

The record reflects that on July 14, 2010, the fire department EMS was called to plaintiff's home where she was reported to have fainted and be unresponsive (R. 584-585, 589).  Upon their arrival, the plaintiff was noted to be unresponsive and have an altered level of consciousness, but upon coming to and complaining of pain, the plaintiff refused to go to the hospital (R. 585).  The record reflects that the plaintiff stated she did not have any insurance and had been turned down for disability that day and was upset and depressed over it (R. 585).  A July 20, 2010, medical record[8] reflects plaintiff's report of impaired speech, slackness and drooling on left side of face (R. 583).  She was some better, but did not go to the emergency room because of not having insurance (R. 583). Upon examination, her speech was noted to be normal but her doctor opined she needed a complete MRI of her back and neck, and also needed government assistance (R. 583).  That record further states that the plaintiff possibly had a TIA, and "Pt has been told if symptoms reoccur, to go to ER <u>ASAP</u>" and "Pt went now has a Bill" (R. 583).

---

[8]The court notes the ALJ did not have the benefit of this record because his opinion predated it.

None of plaintiff's physicians were asked to complete a residual functional capacities questionnaire for the plaintiff and she was not sent for any consultative evaluations.

The ALJ inquired of the VE as to whether someone of the plaintiff's age, education and past work experience, who could lift ten pounds occasionally, less than ten pounds frequently four out of eight hours a day, could sit for six hours but required a sit/stand option, with a limited ability to push and/or pull, with limitations in handling objects, and mild to moderate pain could perform any of the plaintiff's past relevant work[9] (R. 45). The VE responded that such limitations would allow for plaintiff's past work as a legal secretary, receptionist and paralegal (R. 46). However, if the plaintiff's pain was properly classified as moderately severe to severe, all past work would be precluded (R. 46).

Based on the foregoing, the ALJ determined that the plaintiff's sole severe impairment was degenerative disc disease, and that diabetes mellitus, trigger thumb release on the left, irritable bowel syndrome, and hypertension were non-severe (R. 11). The ALJ did not mention the diagnoses of right hand trigger thumb, fibromyalgia, polyarthralgia, radiculopthy, neuropathy, carpal tunnel syndrome,

---

[9]Further limitations were included in this hypothetical, but the hearing record was partially inaudible, resulting in a record which reflects the limitations as "Never climb ladders, ropes (INAUDIBLE).  (INAUDIBLE).  Occasionally (INAUDIBLE)" (R. 45).

depression or anxiety at all, even to find the same to be non-severe[10] (R. 11).  The plaintiff received no further treatment for her right hand trigger thumb, although she is right handed and her ability to use that hand is "poor" (R. 41).   Additionally, although the ALJ faulted the plaintiff for not receiving medical care in proportion to her ailments, the records reflect she had no insurance and no means to pay.[11]  The ALJ also concluded that the 2009 MRI and x-rays showed only mild to moderate impairments instead of the severe impairments shown on the April 2008 MRI (R. 15).

Based on the foregoing, the ALJ concluded that the plaintiff could perform sedentary work, except that she could only lift ten pounds occasionally and less than 10 pounds frequently, could stand and walk four hours in an eight hour day but required a sit/stand option, with unlimited pushing, pulling and reaching, but further limited to only gross manipulation and handling no more than frequently (R. 13).

---

[10]Given his statement that the plaintiff had not been treated for irritable bowel syndrome since 2004 (R. 11), the ALJ must have overlooked the 2007 medical records noting the same to be "unchanged" (R. 557), as well as the 2009 records which reflect prescriptions the plaintiff had filled for irritable bowel syndrome (R. 563).

[11]The ALJ further asserts that "[i]n terms of the claimant's alleged inability to work due to chronic back pain and neuropathy, the claimant has not generally received the type of medical treatment one would expect for a totally disabled individual.  Further, objective medical evidence does not support the severity of symptoms which the claimant has alleged" (R. 14). However, the record clearly supports that her regular treating physician certainly wanted to send the plaintiff for a number of tests and refer her to a number of specialists, but the plaintiff did not do these things because of a lack of ability to pay for them.

The ALJ thus found, with these limitations, that the plaintiff could return to her past relevant work as legal secretary, paralegal and receptionist (R. 16).

The plaintiff argues that the opinion of the ALJ is not supported by substantial evidence in a variety of manners and that the Appeals Council should have remanded the claim for new evidence.[12]  The plaintiff faults the ALJ for rejecting the treating physician's opinions, failing to develop the record, and failing to base his residual functional capacity findings on substantial evidence.

## Standard of Review

In a Social Security case, the initial burden of establishing disability is on the claimant, who must prove that due to a mental or physical impairment he is unable to perform his previous work.  If the claimant is successful the burden shifts to the Commissioner to prove that the claimant can perform some other type of work existing in the national economy.  *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.1987).

This court's review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the  correct legal standards were applied.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971); *Wolfe v. Chater*, 86

---

[12]The plaintiff submitted a further statement of Dr. Taher to this court for the first time, as Exhibit A to her memorandum opinion.

F.3d 1072, 1076 (11th Cir.1996); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir.1990). "Substantial evidence" is generally defined as "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206 (1938)); *Miles v. Chater*, 84 F.3d 1397 (11th Cir.1996); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983).

In determining whether substantial evidence exists, this court must scrutinize the record in its entirety, taking into account evidence both favorable and unfavorable to the Commissioner's decision. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir.1988); *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir.1987). "Even if the Court finds that the evidence weighs against the Commissioner's decision, the Court must affirm if the decision is supported by substantial evidence." *Allen v. Schweiker*, 642 F.2d 799,800 (5th Cir.1981); *see also Harwell v. Heckler*, 735 F.2d 1292 (11th Cir.1984); *Martin v. Sullivan*, 894 F.2d 1520 (11th Cir.1990).

This court must also be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988); *Bridges v. Bowen,* 815 F.2d 622, 624 (11th Cir.1987); *Davis v. Shalala*, 985 F.2d 528 (11th Cir. 1993). However, no such presumption of correctness applies to the Commissioner's conclusions of law,

including the determination of the proper standard to be applied in reviewing claims. *Brown v. Sullivan*, 921 F. 2d 1233, 1235 (11th Cir. 1991); *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991).   Furthermore, the Commissioner's "failure to ... provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal."  *Cornelius*, 936 F.2d at 1145-1146.

When making a disability determination, the ALJ must consider the combined effects of all impairments.  *Davis v. Shalala*, 985 F.2d at 533; *Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir.1990); *Walker v. Bowen*, 826 F.2d 996, 1001 (11th Cir.1987).  When more than one impairment exists, the plaintiff may be found disabled even though none of the impairments considered alone would be disabling. *Id*.  The ALJ must evaluate the combination of impairments with respect to the effect they have on the plaintiff's ability to perform the duties of work for which he or she is otherwise capable. *Lucas v. Sullivan*, 918 F.2d 1567, 1574 (11th Cir.1990).  Merely reciting that the plaintiff's impairments in combination are not disabling is not enough. *Walker*, 826 F.2d at 1001.

## Legal Analysis

In this case, the ALJ determined that the plaintiff had the residual functioning capacity to perform her past relevant work at limited range of sedentary activity (R.

13).   However, the record is devoid of any medical opinions which support or even contradict such a finding.   Although the ALJ faults the plaintiff for not receiving more medical care than she has, the record is replete with plaintiff declining treatment due to an inability to pay for it.   The ALJ's broad statement that the plaintiff's "failure to seek consistent treatment ... is inconsistent with the severity of symptoms which she has alleged" as a basis to find her allegations of pain non-credible is error.   The Eleventh Circuit has repeated held that poverty can excuse noncompliance with medical treatment. *See e.g., Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir.1988). *See also* SSR 96–7p ("[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."). Therefore, before denying an application based on a failure to comply with prescribed medical care, the ALJ must consider whether the claimant is able to afford the medical care. *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir.2003).

The ALJ further used the 2009 MRI to discount the findings of the April 2008 MRI.   In contrast to the ALJ's belief that the 2009 MRI showed improvement, or only mild to moderate underlying rotator scoliosis with facet and disc DJD, there is no

evidence that these impairments were in place of the findings of near disc collapse in the 2008 MRI. Rather, the 2009 MRI found mild underlying rotary scoliosis, multilevel degenerative disc signal changes, most prominently at 4/5 and 5/1, moderate facet DJD at multiple levels, 4/5 disc space height loss, probable right spondylolysis and mild right spondylolisthesis, and eccentric disc bulging and facet DJD, more prominent on the right (R. 364). There was also significant narrowing in the right lateral recess at the 4/5 level, with likely impingement on the right 5/1 root, and moderate bilateral foraminal narrowing at 5/1 (R. 364). Dr. White opined that the plaintiff has lateral recess stenosis[13] and markedly degenerative discs at L4 and L5 and probably herniation (R. 366). The ALJ's determination that the plaintiff's degenerative disc disease is a "mild to moderate condition" (R. 16) is wholly unsupported by the above records and flies in the face of the substantial evidence in the plaintiff's medical records.

Having considered the medical records above, including Dr. White's finding of "markedly degenerative discs ... and probable herniation" (R. 366), the ALJ should

---

[13]Stenosis is a 'narrowing' of any tubular vessel or structural passageway within the body. Lateral Recess Stenosis is a condition where the narrowing reduces the available space within the exit doorway (foramen) of the spinal canal. This may be caused by arthritic overgrowth of the facet joints, degeneration of the disc with loss of disc height and overriding of the facet joints with consequent bulging of the disc. This resultant loss of space in the foramen can cause squeezing or pinching of the nerve roots as they exit the spine through the doorway. http://www.spinal-foundation.org/Conditions/Lateral-Recess-Stenosis

have applied the Eleventh Circuit pain standard in assessing the plaintiff's credibility. That standard requires the ALJ to consider whether there is "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Wilson v. Barnhart,* 284 F.3d 1219, 1225 (11th Cir.2002). Here, there is evidence of an underlying medical condition, objectively determined, that "can reasonably be expected to give rise to the claimed pain."

Compounding the error, no medical opinion supports the limitations adopted by the ALJ.  No medical opinion regarding the plaintiff's ability to perform work at any level on a regular basis appears anywhere in the record before this court.  Rather, the court has before it several statements of the plaintiff's treating physicians that the plaintiff is physically unable to perform any work.  The ALJ gives little weight to the plaintiff's treating physicians, and little weight to the State Agency Disability Specialist (R. 16).  The only basis the ALJ gives for these determinations is the twisted logic that because Dr. Taher wanted to send the plaintiff for further diagnostic testing, his opinions regarding the plaintiff's abilities must not be based on diagnostic testing (R. 16).  Although a consultative examination including opinions regarding the plaintiff's limitations would have been of great help given the record in this case,

17

none was obtained.  The ALJ always has an affirmative duty to develop a fair, full record. *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir.1997).  In some cases, this duty extends to obtaining a consultative examination when the same would be of benefit in the administrative process.  *See e.g.*, 20 C.F.R. §§ 404. 1517; 416.917.  The failure of an ALJ to order a consultative examination, when such an evaluation is necessary to make an informed decision, constitutes justifiable cause for a remand to the Commissioner.  *Reeves v. Heckler,* 734 F.2d 519, 522 n.1 (11th Cir.1984).

Having no consultative examination upon which to rely, the ALJ also rejected the opinions of the plaintiff's treating physicians.  Under Eleventh Circuit precedent, the ALJ must provide "good cause" for rejecting a treating physician's medical opinions. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir.1997); *Winschel v. Commissioner of Social Sec.*, 631 F.3d 1176, 1179 (11th Cir.2011) (Absent "good cause," an ALJ is to give the medical opinions of treating physicians "substantial or considerable weight.*")*; *see also* 20 C.F.R. §§ 404.1527(d)(1)-(2), 416.927(d)(1)-(2). Good cause exists "when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Winschel,* 631 F.3d at 1179 (quoting *Phillips*, 357 F.3d at 1241).  In order to disregard a treating physician's opinion, the ALJ "must clearly articulate [the]

18

reasons" for doing so. *Winschel,* 631 F.3d 1176 at 1179; *Phillips*, 357 F.3d at 1240–41. The fact that the treating physician's opinion is contradicted by a non-examining physician is not good cause for rejecting the treating physician's opinion in favor of the non-examining physician's opinion. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir.1988) ("The opinion of a non-examining physician is therefore entitled to little weight when it contradicts the opinion of an examining physician").

Absent "good cause" to the contrary, an ALJ is to give the medical opinions of treating physicians "substantial or considerable weight." *Lewis*, 125 F.3d at 1440; see also 20 C.F.R. §§ 404.1527(d)(1)-(2), 416.927(d)(1)-(2). Moreover, the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir.1987). A statement that the ALJ carefully considered all the testimony and exhibits is not sufficient. Because the ALJ gave little weight to every medical opinion in the record, the court finds a remand is necessary for the ALJ to explicitly consider, and explain the weight accorded to, those opinions. *See e.g., Winschel*, 631 F.3d at 1179. In particular, the ALJ must accept one medical opinion as controlling before he can reject another medical opinion which contradicts it.

Lastly, the court notes that the plaintiff has submitted a number of exhibits to either the Appeals Council or this court for the first time. These exhibits clearly

19

bolster the plaintiff's claim of multiple debilitating ailments and should be considered by the ALJ upon remand.  *See e.g.*, *Ingram v. Commissioner of Social Security Administration*, 496 F.3d 1253, 1262 (11th Cir.2007)[14], (when a claimant properly presents new evidence to the Appeals Council, a reviewing court must consider whether that new evidence renders the denial of benefits erroneous).

After applying the "pick and choose" method to determine plaintiff's "severe" ailments, the ALJ seemingly crafted limitations to the VE in his hypothetical out of thin air.  While some of the given limitations may be grounded on a finding that the plaintiff is extremely limited in her ability to perform work related activities due to her back, the court can only guess.  For example, the ALJ rejected plaintiff's previous diagnosis and treatment for bilateral trigger thumb as a severe impairment, but then limited grasping to "frequent" and included only jobs requiring "gross manipulation"

---

[14]In *Ingram*, the Eleventh Circuit clarified its standards for consideration of evidence first submitted post-ALJ decision:

> ...evidence first presented to the district court could not be considered for the purposes of a sentence four remand because "a reviewing court is limited to the certified administrative record in examining the evidence," ... but we explained that a federal court "should remand a case to the Secretary to consider such evidence if a claimant makes a sufficient showing" under sentence six....

> We also have held that remand under sentence six is appropriate for the Commissioner to consider new evidence that the Commissioner did not have an opportunity to consider because the evidence was not properly submitted to the Appeals Council....

*Ingram*, 496 F.3d at 1267-1268.

in his hypothetical.  The VE responded with jobs previously performed by the plaintiff which require typing, but no discussion of whether such jobs exceed the limitation of gross manipulation only is contained in the opinion.  Thus, the hypothetical did not reflect all of the plaintiff's limitations as required.  *See e.g., Smith v. Social Security Admin.*, 272 Fed.Appx.789, 800 (11th Cir.2008), citing *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999) ("to constitute substantial evidence, the VE's testimony must be based on a hypothetical posed by an ALJ which encompasses all of the claimant's impairments").  The court therefore finds that the hypothetical to the VE was not sufficient for purposes of establishing that the plaintiff could return to her past relevant work.

The plaintiff seeks to have this court either award benefits or remand to require consideration of new evidence.  A court may reverse for an award of benefits in two narrow circumstances: 1) where the Commissioner has already considered all the essential evidence and the cumulative effect of the evidence establishes disability without any doubt; and 2) where a claimant has suffered an injustice. *See Davis*, 985 F.2d at 534; *Walden*, 672 F.2d at 839.  Based on the record and the ALJ's decision, the court finds the proper remedy is a remand to the ALJ for further proceedings.  Specifically, the court is of the opinion that the plaintiff should be afforded a new hearing, including VE testimony to include relevant hypotheticals comprised of

plaintiff's impairments, further consideration of the evidence, proper application of the law, and further development of the record, including a consultative examination should the plaintiff's physical limitations remain in question upon remand.

**Conclusion**

Based on the above stated reasons, it is **ORDERED** that the decision of the Commissioner is **REVERSED** and this case is **REMANDED** to the Agency for further action consistent with this opinion, as set forth herein.

**DONE** and **ORDERED** this the 21st day of February, 2012.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE